**MARC JACOME**
California Bar No. 328406
**CARMEL ABUZAID**
Texas Bar No. 24132167
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666

Attorneys for Mr. Hector Torres-Espinoza

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>          v.<br><br>HECTOR TORRES-ESPINOZA,<br><br>                    Defendant. | CASE NO.: 23-CR-00144-TWR<br><br>Hon. Todd W. Robinson<br>Courtroom 3A<br>Date: May 5, 2023<br>Time: 1:30PM<br><br>**MR. TORRES-ESPINOZA'S MOTION TO DISMISS UNDER 8 U.S.C. § 1326(d)** |

## I.    INTRODUCTION

The Court should dismiss the information under 8 U.S.C. § 1326(d).  Hector Torres-Espinoza ("Mr. Espinoza") received ineffective assistance of counsel throughout his removal proceedings.  Compounding this error, the Immigration Judge also committed due-process violations, such as failing to provide a full and fair hearing on his application for voluntary departure and entering an invalid waiver of appeal.  These errors prejudiced Mr. Espinoza's ability to receive a U-Visa, voluntary departure, and any other form of relief.  Thus, the entry of his removal order was fundamentally unfair.  8 U.S.C. § 1326(d)(3).  Because he received ineffective assistance of counsel and did not knowingly or intelligently waive his right to appeal, the requirements of 8 U.S.C. §§ 1326(d)(1)-(2) are met.

## II.    STATEMENT OF FACTS

### A.    Mr. Espinoza's Background

Mr. Espinoza had a traumatic childhood.  He spent his first four years in the town of Camalu, Baja California, Mexico.  Exh. A, Declaration of Hector Torres-Espinoza at ¶ 3.  His father, Juan Torres Martinez, was repeatedly absent from the home and, when present, was drunk and violent.  Exh. B, Declaration of Eleuteria Espinosa-Lopez, at ¶ 5.  The last straw for his mother, Eleuteria Espinosa-Lopez was when Mr. Espinoza's father hit her on the head with a cast iron pan, causing her to bleed profusely.  *Id*. at ¶ 6.  Fearing for her life, she left with her children. *Id*.

In 1992, Ms. Espinosa-Lopez brought him, his sister Marisela Espinoza-Lopez, and her youngest son, Victor Espinosa-Lopez, to the United States.  *Id.* at ¶ 7.  They settled at a campground in Carlsbad, California.  *Id.* at ¶ 8.  There, a smuggler who was driving them north offered to bring them to Oregon and provide them a place to rent if the mother acted as his girlfriend.  *Id.*  This man, who went by the name Fredy Sandoval-Diaz, became the family's worst nightmare.

From 1993 to 2000, the family experienced seven years of violence, abuse, and torture at the hands of Fredy.  Ms. Espinosa-Lopez was the subject of weekly beatings in which he would whip her, punch her, kick her, pull her hair, and strike her in public.  *Id.* at ¶ 10.  He told her that if she ever spoke to police, she would get deported, and he would take her children.  *Id.*  He knew that she did not speak English, did not have anyone else to speak to, and could not drive a car.  *Id.*  He controlled the household with the threat of violence and took all the money that Ms. Espinosa-Lopez and children earned from working.  *Id.* at ¶ 13.

Fredy was not just a bad influence; he manipulated the children to normalize alcohol and violence.  It began by brutally beating the mother and threatening to hurt the children if they protested.  *Id.* at ¶ 10.  He inflicted severe corporal punishment on the children, and in particular Mr. Espinoza, for common childlike behavior.  *Id.* at ¶ 12.  He often punished Mr. Espinoza and his siblings by forcing

them to kneel and hold a gallon of water indefinitely. *Id.* If they were unable to without crying or collapsing, he punished them more. *Id.* His system of discipline also included a reward: alcohol. Before the brothers were even twelve years old, he gave and encouraged them to drink beer when they did as he said. *Id.* at ¶ 11.

Tragically for Marisela, Fredy used his position of authority to repeatedly rape her for several years, from ages ten to thirteen. Exh. C, Declaration of Marisela Espinoza-Lopez at ¶ 9. He made it clear that no one would believe her, and the mother would be deported if anyone spoke to police. *Id.* at ¶ 10. Because the mother had no one else, the abuse, torture, and rape continued.

In 2000, Ms. Espinosa-Lopez gained the courage to leave Fredy for good. Exh. B at ¶ 17. But the trauma left its mark. Mr. Espinoza was a normal four-year-old, but as he got older, he became quieter and more withdrawn. *Id.* at ¶ 18. Growing up, Mr. Espinoza had excelled in school. *Id.* at ¶ 20. However, after entering high school in 2003 and learning his sister was raped, his academic performance suffered. Exh. A at ¶ 12. He increasingly skipped school, drank alcohol, and failed classes until dropping out in 2006, just four credits short of completion. Exh. A at ¶ 12; *see* Exh. I, Cancellation of Removal Application at 70.

Mr. Espinoza thereafter worked two jobs, as a chrome plater and a fast-food kitchen worker. *Id.* at 55. At the restaurant, he met his girlfriend, Silvia Madrigal, and future mother of their child. *Id.* at ¶ 14. In 2007, Mr. Espinoza's son Enrique was born. Exh. I, at 60. As a father, Mr. Espinoza provided everything his son needed. Exh. A at ¶ 42.

## B.   Initial Immigration Proceedings

Although gainfully employed, Mr. Espinoza's childhood trauma still haunted him. The first consequence was his criminal arrest on May 29, 2010. *See* Exh. I at 51. Immigration and Customs Enforcement ("ICE") placed a hold on Mr. Espinoza and took him into custody on June 2, 2010. Exh. A at ¶ 16.

On June 2, 2010, Mr. Espinoza called his mother from ICE custody. *Id.* The

day before, Ms. Espinosa-Lopez called attorney Rachel M. Aitchison ("Ms. Aitchison") and spoke to an assistant.  Exh. B at ¶ 23; *see* Exh. F, Immigration Attorney Notes at 33.  When Mr. Espinoza called on June 2, his mother was with Ms. Aitchison, who asked to speak to him.  Exh. B at ¶ 24.  Ms. Aitchison spoke to an ICE officer and negotiated a $7,500 bond.  Exh. A at ¶ 16.  That day, Ms. Espinosa-Lopez secured the bond money and signed a contract with Ms. Aitchison "to request bond and apply for cancellation of removal" for her son.  Exh. E, Immigration Retainer Agreement at 25; Exh. B at ¶ 24.  Before his release, ICE served a Notice to Appear charging Mr. Espinoza as removable for being present without inspection.  Exh. G, Notice to Appear at 38–39.

At the first hearing on October 4, 2011, Ms. Aitchison conceded proper service of the NTA, acknowledged Mr. Espinoza's rights and obligations, and admitted all allegations and removability on his behalf.  Exh. H, IJ Proceeding of October 4, 2011, at 41–42.  The Immigration Judge inquired about relief and Ms. Aitchison indicated Mr. Espinoza would seek cancellation of removal.  *Id.*  The IJ set the filing deadline for the application on January 30, 2012, and the final hearing to be December 12, 2012.  *Id.* at 43.

After the hearing, Ms. Aitchison filed a 33-page cancellation application.  Exh. I at 45–46.  The exhibits included the forms, payment, a photo, his and his son's birth certificates, his school records and one letter of support.  *Id.* at 46.  Notably absent was evidence of continuous physical presence and any evidence or explanation as to why removal would result in exceptional hardship to his son.  When the filing deadline arrived, Ms. Aitchison did not supplement the application, despite receiving 4 years of tax records and 10 more letters of support.  *See* Exh. J.

The summer of 2012 was life-changing for Mr. Espinoza's family.  First, on May 29, Marisela and Ms. Espinosa-Lopez went to police and reported that Fredy raped Marisela.  Exh. K, Fredy Police Report at 145–48.  This action eventually led to Fredy's conviction as well as Marisela and Ms. Espinosa-Lopez each receiving

a U-Visa.  Exh. L, Marisela Espinoza-Lopez U-Visa Approval; Exh. M, Eleuteria Espinosa-Lopez U-Visa Approval.  Importantly, Ms. Espinosa-Lopez had asked Ms. Aitchison if she could qualify for a U-Visa, but Ms. Aitchison said she would not.  Exh. B, at ¶ 29.  Second, the government created Deferred Action for Childhood Arrivals, which Victor would receive in 2013 using Ms. Aitchison's services.  Exh. D, Declaration of Victor Espinosa-Lopez at ¶16.

### C.    Criminal Prosecution and Guilty Plea

The summer was also life-changing for Mr. Espinoza.  On July 17, 2012, Mr. Espinoza was charged with Second Degree Assault and Failure to Perform Duties of a Driver to an Injured Person.  Exh. N at 167.  A week later, Mr. Espinoza was indicted with First Degree Assault, Failure to Perform Duties of a Driver to an Injured Person, three counts of Unlawful Use of a Weapon, Driving Under the Influence, and Reckless Driving.  Exh. O at 169–70.  His bail was set at $250,000 and Erik M. Bucher was appointed as his counsel.  *Id.* at 170; Exh. A at ¶ 25.

Within the first week, Mr. Bucher visited to introduce himself.  Mr. Bucher discussed the charges and told Mr. Espinoza and his family not to post bail since there was an ICE detainer.  Exh. A at ¶ 27; Exh. B at ¶ 25.  Mr. Bucher did advise that a conviction would have consequences, but from the beginning told Mr. Espinoza that he had to focus on his criminal case first and worry about immigration afterward.  Exh. A at ¶ 26.  Relying on this advice, Mr. Espinoza did not further inquire about immigration.  *Id.*

While Mr. Espinoza was in state custody, Ms. Aitchison's only communication with him was to let him know that his immigration case was administratively closed.  When they spoke in 2013, Ms. Aitchison informed him she postponed his proceedings before but then had to close proceedings while he waited to go to trial.  Exh. A at ¶ 29.  She took the wait-and-see approach, but never informed him that, if convicted, he would be ineligible for cancellation and she would not represent him.  *Id.*

The day after trial began, on June 19, 2013, Mr. Espinoza pled guilty to Second-Degree Assault, Failure to Perform Duties of a Driver, and Driving Under the Influence.  Exh. P at 172–75.  After the State's first witnesses, Mr. Bucher convinced him to plead guilty.  Exh. A at ¶ 32.  Mr. Espinoza was shocked and confused but felt he had no other choice.  *Id.*  He did not prepare the petition and only signed where Mr. Bucher indicated.  *Id.*  In the petition, the word "accidentally" is struck out, with "knowingly" written in.  Exh. P at 174.  There are no initials to show that Mr. Espinoza agreed to that interlineation.  Mr. Bucher did not discuss cancellation specifically and never said that his conviction and deportation would make him permanently inadmissible to the U.S.  Exh. A at ¶ 33.

### D.    Final Proceedings and Removal

After pleading guilty on June 19, 2013, Mr. Espinoza spent almost another five years in prison and then was released to ICE custody.   On May 23, 2018, ICE moved to re-calendar his removal proceedings, but the filing was initially rejected for lack of service to Ms. Aitchison.  The next day, Ms. Aitchison received notice from both the immigration court and ICE that there was a motion to re-calendar and change venue.  On May 31, 2018, Mr. Espinoza filed a bond reconsideration request to the immigration court, but it was rejected because Ms. Aitchison, as his attorney of record, was required to submit all filings.  Exh. Q at 177–79.   On June 6, 2018, Ms. Aitchison received notice of the rejected filing.  *Id.*

On April 7, 2018, Ms. Aitchison spoke with Mr. Espinoza via phone to ask if he wanted her services.  Exh. A at ¶ 36; Exh. F at 32.  She said it was a new case, and she could only help him fight it if there was a new contract and more payment.  Exh A at ¶ 36.  She did not explain that she was not an Oregon attorney, not a specialist in criminal law, and had not researched Oregon law.  Exh. F at 32.  Despite having identified his conviction as "uncertain" in her notes, Ms. Aitchison did not discuss the possibility of post-conviction relief, or that he may need an Oregon attorney to assess his case.  Exh. A at 39; Exh. F at 36 (noting "uncertain

ground of conviction"). When she said his chance of bond was low, he asked and she agreed to help him seek voluntary departure. *Id.*; Exh. F at 32 (noting she can help seek "VD/removal"). When asked, she minimized the differences between voluntary departure and removal. *Id.* at ¶ 37. She did not suggest the possibility of a U-Visa, despite knowing his sister had applied. Exh. B at ¶ 29. There is no indication she discussed appeal or got his consent to waive appeal. Exh. F at 32.

On June 15, 2018, Ms. Aitchison was scheduled to telephonically appear but would have missed the appearance if the IJ had not called her three times. Exh. R at 181–83. With the proceedings already underway, Ms. Aitchison moved to withdraw the application for cancellation of removal, citing statutory ineligibility, and applied for voluntary departure on his behalf. *Id.* After ICE opined that his conviction was a crime involving moral turpitude, an aggravated felony, or otherwise a reason to deny on discretion, the IJ denied voluntary departure without Ms. Aitchison saying a word in response. *Id.* at 184–85. The IJ denied "as a matter of discretion" without any further explanation. *Id.* at 185. After Mr. Espinoza was ordered removed and proceedings had already ended, the ICE attorney had the IJ ask Ms. Aitchison if he "wished to appeal." *Id.* Ms. Aitchison responded "no" without being able, or ever having discussed the matter with Mr. Espinoza. *Id.*

### E.    The Present Prosecution

On January 1, 2023, the United States charged Mr. Espinoza with attempted illegal reentry in violation of 8 U.S.C. § 1326. Mr. Espinoza has pled not guilty.

## III.    LEGAL ARGUMENT

A defendant charged with 8 U.S.C. § 1326 has a due process right to collaterally attack the removal order upon which the charge is predicated. *United States v. Mendoza-Lopez*, 481 U.S. 828, 837–38 (1987). Following *Mendoza-Lopez*, Congress codified the procedure for a collateral attack, requiring that the defendant show: (1) he exhausted the administrative remedies that were available to seek relief from removal; (2) the removal proceedings improperly deprived him

MOTION TO DISMISS UNDER 8 U.S.C. § 1326(D)

of judicial review; and (3) the entry of the order was fundamentally unfair. *See* 8 U.S.C. § 1326(d). Fundamental unfairness is fulfilled where defects at the removal proceeding deprived the defendant of due process and he suffered prejudice as a result. *United States v. Barajas-Alvarado*, 655 F.3d 1077, 1088 (9th Cir. 2011).

The government relies on the 2018 removal order to support the charge pursuant to 8 U.S.C. § 1326(a) and (b). That order was fundamentally unfair. Mr. Espinoza received ineffective assistance of counsel when Ms. Aitchison misadvised him regarding his options for relief and generally violated the duty of competence. At the final hearing, Ms. Aitchison and the IJ jointly failed to ensure a fair hearing on his voluntary departure application and entered an appeal waiver without informing him of his rights or confirming that he waived appeal. These errors prejudiced his ability to receive a U-Visa, voluntary departure, or other relief. Since he received ineffective assistance of counsel and did not knowingly or intelligently waive his right to appeal, the requirements of § 1326(d)(1)-(2) are met. *United States v. Gomez*, 757 F.3d 885, 893 (9th Cir. 2014); *United States v. Cerna,* 603 F.3d 32 (2d Cir. 2010).

## A. The Removal Order Was Fundamentally Unfair

Section 1326(d)(3) requires Mr. Espinoza to show that the entry of his removal order was fundamentally unfair. The Fifth Amendment guarantees due process in deportation proceedings. *See Colmenar v. INS,* 210 F.3d 967, 971 (9th Cir. 2000) (citing *Campos–Sanchez v. INS*, 164 F.3d 448, 450 (9th Cir. 1999). This means that a noncitizen facing deportation is "entitled to a full and fair hearing of his claims and a reasonable opportunity to present evidence on his behalf." *Id.* (citing *Campos-Sanchez*, 164 F.3d at 450 and 8 U.S.C. § 1229a(b)(4)). The United States Court of Appeals for the Ninth Circuit ("the Ninth Circuit") has held that a removal order is fundamentally unfair if "the defendant's due process rights were violated in the removal proceeding and he suffered prejudice as a result." *United States v. Ubaldo-Figueroa*, 364 F.3d 1042, 1048 (9th Cir. 2004).

1        1.   Mr. Espinoza Received Ineffective Assistance

2        To establish that ineffective assistance of counsel amounts to a due process

3   violation, a defendant must show (1) that "the proceeding was so fundamentally

4   unfair that the alien was prevented from reasonably presenting his case," and (2)

5   prejudice. *United States v. Lopez-Chavez,* 757 F.3d 1033, 1041 (9th Cir. 2014)

6   (quoting *Lin v. Ashcroft*, 377 F.3d 1014, 1023 (9th Cir. 2004)).  A person's "right

7   to a full and fair presentation of his claim include[s] the right to have an attorney

8   who would present a viable legal argument on his behalf supported by relevant

9   evidence[.]" *Id.* at 1041.  Prejudice is found "when the performance of counsel was

10  so inadequate that it may have affected the outcome of the proceedings."  *Id.* at

11  1043 (citing *Correa–Rivera v. Holder*, 706 F.3d 1128, 1133 (9th Cir. 2013)).

12      Ms. Aitchison "failed to perform with sufficient competence" in various

13  respects.  *Mohammed v. Gonzales*, 400 F.3d 785, 793 (9th Cir. 2005).  She

14  misadvised Mr. Espinoza regarding his options.  In particular, she failed to uncover

15  his U-Visa eligibility while leading him to file a faulty application for cancellation

16  of removal.  *See id.* at 789–90 (finding infectiveness for not investigating and

17  presenting a claim); *Lin*, 377 F.3d at 1024–26 (finding ineffectiveness for failure to

18  have contact with client and prepare the case).  Ms. Aitchison also violated the

19  duties of competence and diligence when she failed to appear for part of the removal

20  hearing, failed to say a word in support of his application for relief, and waived

21  appeal without ever asking or confirming he wished to waive appeal.  *See Lin*, 337

22  F.3d at 1026–27 (finding ineffective assistance for failure to attend the hearing,

23  failure of advocacy, and failing to pursue appeal).

24          a.   *Failing to Investigate Relief and Mitigation*

25      To determine ineffectiveness, the analysis begins by "asking if competent

26  counsel would have acted otherwise." *Maravilla-Maravilla v. Ashcroft*, 381 F.3d

27  855, 858 (9th Cir. 2004).  A competent immigration attorney would have completed

28  a full intake with Mr. Espinoza and his mother before deciding relief.  That attorney

would have uncovered potential eligibility for various claims of relief and consulted with her client on the benefits and disadvantages of each.  Any diligent attorney would have uncovered a strong potential U-Visa claim and advised Mr. Espinoza, his mother, and his sister to report this abuse to police to seek a U-Visa.  Given the strength of their U-Visa claim, that attorney would have advised Mr. Espinoza to seek dismissal or administrative closure of his proceedings.  Given the difficulty of cancellation, a competent attorney would not lead Mr. Espinoza to apply for cancellation without conducting investigation to establish exceptional and extremely unusual hardship or see if other relief was possible.

Ms. Aitchison had a duty to investigate all viable forms of relief and any mitigation evidence that could support the application she advised him to seek.  An attorney is ineffective when she fails to undertake basic investigation that could be determinative.  *See Mohammed*, 400 F.3d at 793.  In *Mohammed*, immigration counsel preparing an asylum claim never asked whether his client suffered female genital mutilation.  *Id.* at 789–90.  Because that fact could support a viable claim of asylum, the lack of investigation was a prejudicial due process violation.  *Id.* at 794–803.  Similarly, in *Lin*, the Ninth Circuit found ineffective assistance of counsel where counsel failed to interview client and prepare the case to present a coherent asylum claim.  *Lin*, 377 F.3d at 1024–25.

Here, Ms. Aitchison did minimal to no investigation.  She relied exclusively on a one-page intake sheet and neglected to uncover his eligibility for a U-Visa and other relief.  The intake showed Mr. Espinoza lived undocumented in the U.S. since 1993 and had a 2-year-old U.S. citizen child; there were no questions about how and why they came to the United States, how they arrived in Oregon, or whether they had been a victim of crime, all of which are basic questions to determine eligibility for asylum, U-Visa, T-Visa, and other relief.  *See* Exh. F at 33.  If Ms. Aitchison had asked any of those questions to Ms. Espinosa-Lopez or Mr. Espinoza, she would have discovered the viability of the U-Visa claim.  However, the retainer

shows that only after one conversation with Ms. Espinosa-Lopez, Ms. Aitchison had already decided Mr. Espinoza would pursue cancellation of removal. Afterward, the two had no substantive communication, aside from Mr. Espinoza confirming he gathered documents, many of which Ms. Aitchison never submitted.

The failure to investigate was not only a failure to consider other relief, but also a failure to investigate and submit a cancellation application that had a possibility of success. For instance, she did not investigate any theory of mitigation to account for his 2010 arrest to establish good moral character. *See Andrus v. Texas*, 140 S. Ct. 1875 (2020) (finding ineffective assistance in capital sentencing for failure to investigate client's traumatic upbringing); *Wiggins v. Smith*, 539 U.S. 510, 512 (2003) (same). She never sought to uncover mitigating evidence as to why he drank or failed to graduate high school. Relatedly, she did not advise he should seek rehabilitation after his arrest. *See Santamaria-Ames v. INS*, 104 F.3d 1127, 1132 (9th Cir. 1996) (discussing the importance of rehabilitation to show good moral character). Lastly, she did not investigate how his removal would cause exceptional and extremely unusual hardship against his son, which is an essential element for cancellation. *See* 8 U.S.C. § 1229b(b)(1)(D). Overall, Ms. Aitchison fell below the standard of competence in her investigation of the case.

### b.    *Misadvice Regarding Cancellation of Removal*

Misunderstanding of the law, misunderstanding of a case, inattention, and a failure of common sense are all bases to find ineffective assistance of counsel. *Greiner v. Wells*, 417 F.3d 305, 325 (2d Cir. 2005) (citing various cases). Each one of these reasons are present here.

First, Ms. Aitchison exemplified a misunderstanding of law, the case, and common sense when she decided to pursue cancellation as his only relief. Any competent immigration attorney knows that the "exceptional and extremely unusual hardship" standard is one of if not the "highest and most difficult standard that exists in US law." Robert S. Meyers, J.D., Psy.D., *The "Exceptional and Extremely*

*Unusual Hardship" Waiver*, in CONDUCTING PSYCHOLOGICAL ASSESSMENTS FOR U.S. IMMIGRATION CASES 61–69 (2020); *see also In re Monreal*, 23 I. & N. Dec. 56, 62 (BIA 2001).   In *Monreal*, the Board of Immigration Appeals held this hardship is "substantially different from, or beyond, that which would normally be expected from the deportation[.]" *Monreal*, 23 I. & N. Dec. at 65.  Ms. Aitchison did not acknowledge or consider this hurdle.

She instead induced Mr. Espinoza to rely on her advice that he was facially eligible and neglected to take steps to make it a feasible application.   For comparison, the BIA has upheld denials where the noncitizen had up to five U.S. citizen children with various health problems and where the noncitizen is a single-mother and sole-provider of two U.S. citizen children.  *See Matter of J-J-G-,* 27 I. & N. Dec. 808 (BIA 2020); *Matter of Andazola*, 23 I. & N. Dec. 319 (BIA 2002). In Mr. Espinoza's application, there was not any evidence or theory as to why his deportation would cause exceptional hardship.  This is particularly egregious when "economic detriment alone is insufficient to support even a finding of extreme hardship." *Andazola*, 23 I&N Dec. at 323.  Based on her submission, she had no theory when she offered her services and no theory by the time of application.

### c.   Filing an Incomplete and Faulty Application

After his first hearing, Ms. Aitchison filed an application for cancellation of removal with no brief and insufficient evidence to establish the claim.  It is plainly ineffective assistance when an attorney fails to submit relevant, available evidence that is necessary to support a claim.  *Morales Apolinar v. Mukasey*, 514 F.3d 893, 895 (9th Cir. 2008) (finding ineffective assistance for failing to document continuous physical presence and develop the argument for exceptional hardship). Although she was given until January 30, 2012, she deliberately chose to not seek more evidence or supplement it with the evidence she had received.

Ms. Aitchison filed an application that failed to address exceptional hardship. To the contrary, the application suggested that Mr. Espinoza would not be able to

meet such a standard.  Ms. Aitchison included extraneous information that Mr. Espinoza and Silvia had separated and that their son received benefits that were unknown to Mr. Espinoza.  Such facts tended to show he was not present in his son's life when in fact, he was.  He also had an on-and-off relationship with Silvia well beyond 2011.  As in *Lin*, Ms. Aitchison's lack of preparation and investigation prevented her from presenting facts and legal arguments fundamental to the claim. *See Lin*, 377 F.3d at 1014.  A competent attorney would have sought declarations by him and his family, along with psychological evaluations or medical evidence, to show his deportation would cause academic, medical, and psychological hardship. *See* Meyers, *infra* at 13 (discussing the important of forensic psychology to establish exceptional hardship); *see also* Anita Gupta, *Proving Medical and Psychological Hardship for Non-LPR Cancellation of Removal*, ILRC, (2020).

Ms. Aitchison filed a plainly inadequate application in other respects as well and never supplemented the application by the deadline.  She failed to submit evidence showing 10 years of continuous physical presence per 8 U.S.C. § 1229b(b)(1)(A), despite claiming to have included "[p]roof of Respondent's continuous, physical presence."  Exh. I at 53.  The school records only covered 1993 to 1994 and 2003 to 2006. *Id.* at 65–71.  Moreover, Mr. Espinoza disclosed that he dropped out of high school and was arrested but was never advised to seek rehabilitation or complete the last four credits of high school.  Despite receiving his tax records and ten more letters of support, Ms. Aitchison never submitted those documents or any other evidence by January 30, 2012.

### d.    Malpractice Before Final Removal Hearing

When Mr. Espinoza and Ms. Aitchison spoke via phone on June 7, 2018, she again demonstrated her misunderstanding of the law, misunderstanding of the case, and inattention to detail. *See Greiner*, 417 F.3d at 325.  A competent attorney would have either withdrawn with cause or done the work necessary to properly advise and represent Mr. Espinoza.  Instead, Ms. Aitchison convinced him to accept

deportation or voluntary departure while misadvising him regarding their differences by saying any difference was inconsequential. Legally, the differences are numerous, two of the most important being that deportation would bar him from entering for 10 years to life and would subject him to this prosecution under 8 U.S.C. § 1326 if he ever returned illegally. Further, although Ms. Aitchison was not an Oregon attorney and not familiar with Oregon law, she determined he had little chance of success with bond or cancellation of removal but failed to mention the potential necessity of post-conviction relief with an Oregon attorney.

Ms. Aitchison was contractually bound to represent Mr. Espinoza in bail proceedings and his cancellation application. He and his mother had paid the $7000 in full. In return, Ms. Aitchison had a 5-to-10-minute call for ICE bond and submitted a 33-page incomplete application for cancellation of removal. When they spoke on June 7, 2018, Ms. Aitchison claimed it was a new case and she would need to be paid more. Based on this position, Ms. Aitchison said she would only be able to seek deportation or voluntary departure for Mr. Espinoza. This is malpractice and ineffective assistance of counsel because she unduly pressured him to accept deportation or voluntary departure. *See Nehad v. Mukasey*, 535 F.3d 962, 967–72 (9th Cir. 2008) (finding ineffective assistance when counsel pressured client to accept voluntary departure under threat of counsel's withdrawal). Ms. Aitchison was aware he had asked for bond. Instead of assisting him, she asked for more money. When he could not pay, she convinced him he had little hope and offered to help secure deportation or voluntary departure.

Instead of providing well-researched advice, Ms. Aitchison said she would only help Mr. Espinoza seek deportation or voluntary departure while conflating their differences. An attorney commits ineffective assistance by failing to advise their clients on the benefits of voluntary departure. *See United States v. Gonzalez*, 2015 WL 3443942 (S.D.N.Y. 2015). Ms. Aitchison assured him any difference was minimal in terms of returning. Voluntary departure offers at least four benefits:

potentially avoiding detention; choosing a departure date; facilitating readmission by avoiding deportation-related entry bars; and avoiding § 1326 prosecution. *Id.* at 2. She discussed none of these and failed to mention that, if his crime was an aggravated felony, he would be permanently excluded. *See* 8 U.S.C. § 1182(a)(9)(A)(i). Just as *Padilla v. Kentucky* held that a criminal defense attorney must advise the immigration consequences of a plea, an immigration attorney must advise the consequences of deportation. *See* 559 U.S. 356 (2010).

### e. Failure to Advocate at Final Removal Hearing

The final removal hearing cemented Ms. Aitchison's ineffectiveness by exposing her as an unpunctual and un-zealous advocate. At the final hearing, Ms. Aitchison was scheduled to appear telephonically but failed to appear for the beginning and then, after connecting, inexplicably failed to argue a word in support of Mr. Espinoza's voluntary departure application. After witnessing and participating in due process violations, and without ever confirming that he wished to waive appeal, Ms. Aitchison waived appeal on Mr. Espinoza's behalf and potentially ensured he would be forever barred from entering the United States. While the fact she was late may not itself be a ground for ineffective assistance, the fact that she would have not appeared had the IJ not called her three times is telling. Ultimately, she fell below the standard of what competent counsel would do.

Ms. Aitchison's conduct is equal to or worse than the ineffectiveness of the attorney in *Lin*, wherein counsel also appeared telephonically at the final hearing and failed to advocate on behalf of the client. *Lin*, 337 F.3d at 1026. As in *Lin*, Ms. Aitchison "was unprepared, had not expected to argue; did not seek out the evidence she should have found; did not present effectively the evidence she had at hand; [and] presented no legal framework" for the claim. *Id.* at 1027. As in Mr. Espinoza's case, the day of the hearing provides the clearest evidence that Ms. Aitchison was unprepared and unwilling to advocate effectively. Viewed in context, her final performance casts doubt on the entirety of her representation.

1   No competent attorney would have forfeited the opportunity to argue for
2   voluntary departure.  Mr. Espinoza had strong equities to present, even given the
3   information Ms. Aitchison knew.  She knew he lived in the U.S. since he was four,
4   had strong family ties, and had a U.S. citizen son he supported.  Moreover, she had
5   tax records and eleven letters of support written by community members.  Knowing
6   an aggravated felony is a bar to voluntary departure, no competent attorney would
7   fail to respond.  Also, Ms. Aitchison had determined that the record of conviction
8   was unclear but failed to even argue that point.  The lack of advocacy showed she
9   "was unprepared; had not expected to argue; did not seek out the evidence she
10  should have found; did not present effectively the evidence she had at hand; [and]
11  presented no legal framework" for the claim.  *Lin¸* 337 F.3d at 1026.

12  Finally, no competent attorney would have waived appeal on behalf of their
13  client without discussing the issue, and especially not when the proceedings raised
14  clear due process violations.  A lawyer performs ineffectively when an error denies
15  the client their right to appeal.  *See Salazar–Gonzalez v. Lynch*, 798 F.3d 917 (9th
16  Cir. 2015).  The decision to appeal in a criminal case rests with the defendant.  *Roe*
17  *v. Fores-Ortega*, 528 U.S. 470, 485 (2000).  Similarly, the appeal of a removal
18  order was his decision, and she had no right to waive it without speaking with him
19  before or at the hearing.  It is clear she did not do so at the hearing.  She could not
20  know and did not know whether he understood and accepted the decision, yet
21  waived appeal on his behalf in response to a last-second question by the IJ.

22  2.   The IJ Denied Mr. Espinoza Fundamental Due Process

23  Independent of any ineffective assistance, the IJ at the final removal hearing
24  committed fundamental due process errors.  First, the IJ denied Mr. Espinoza a full
25  and fair hearing by not ensuring he had an opportunity to present evidence and
26  argue for voluntary departure.  The IJ allowed Ms. Aitchison to say nothing in
27  support of the application and then summarily denied voluntary departure with
28  virtually no explanation and without weighing any positive equities.  Second, the

1 IJ entered an invalid waiver of appeal when she failed to inform Mr. Espinoza of
2 his rights to appeal and failed to confirm he agreed with or understood the decision
3 to waive appeal.  As a result, Mr. Espinoza was denied his right to due process.

4        *a.*    *The IJ Failed to Provide a Full and Fair Hearing*

5       The Fifth Amendment and the Immigration and Nationality Act both
6 guarantee the right to a "full and fair hearing," which includes a "reasonable
7 opportunity to present evidence." *Colmenar*, 210 F.3d at 971 (citing 8 U.S.C. §
8 1229a(b)(4)).  The statutory rights include "a reasonable opportunity to examine
9 the evidence against the [noncitizen], to present evidence on the [noncitizen]'s own
10 behalf, and to cross-examine witnesses presented by the Government[.]"  8 U.S.C.
11 § 1229a(b)(4)(B).  These rights include the "genuine opportunity to apply for
12 voluntary departure or to present evidence of the facts favoring this relief." *United*
13 *States v. Melendez-Castro*, 671 F.3d 950, 954 (9th Cir. 2012) (citing *Campos-*
14 *Granillo v. INS*, 12 F.3d 849, 852 n. 8 (9th Cir. 1993).  Moreover, when deciding
15 the issue of voluntary departure, the IJ must "weigh favorable and unfavorable
16 factors by evaluating all of them, assigning weight or importance to each one
17 separately and then to all of them cumulatively." *Zamorano v. Garland*, 2 F.4th
18 1213 (9th Cir. 2021) (citing *Campos-Granillo*, 12 F.3d at 852).

19       Both the IJ and Ms. Aitchison violated the right to a full and fair hearing.
20 Here, after government counsel argued against voluntary departure, the IJ
21 recounted the elements of voluntary departure and simply asked: "Anything else?".
22 Exh. R at 184.  In response, Ms. Aitchison simply said "No, your honor," even
23 though the government had just made arguments that, if true, would permanently
24 bar Mr. Espinoza from ever returning to the U.S. legally.  Despite the IJ knowing it
25 was Mr. Espinoza's burden to establish that he satisfied the requirements, *see* 8
26 U.S.C. § 1229a(c)(4), the IJ permitted Ms. Aitchison to say nothing.

27       Moreover, when the IJ ultimately decided to deny voluntary departure, she
28 summarily denied as a matter of discretion "[g]iven the recent and serious offense

in the nature [sic]" without addressing any positive equities.  Exh. R at 185.  "While an immigration judge maintains discretion to grant voluntary departure, such discretion does not 'strip the inquiry of all guideposts.'" *United States v. Cruz-Aguilar*, 394 F. Supp. 3d 1313, 1320 (E.D. Wash. 2019).  The IJ must weigh the positive and negative equities and "[m]ere conclusionary statements are insufficient."  *Id.*  Despite knowing from the record that Mr. Espinoza lived in the U.S. since he was four and had family in the U.S., the IJ acknowledged neither.  *See Campos-Granillo*, F.3d at 852 n.8 (listing favorable factors to include familial ties, a long period of residence in the U.S., "particularly if residence began at a young age", and proof of rehabilitation if a criminal record exists).  The IJ's summary denial was not only curt; it was a clear denial of due process.

### b. The IJ Failed to Inform Him of His Appeal Rights and Confirm He Waived Appeal

Finally, Mr. Espinoza's due process rights were violated because the IJ entered an invalid waiver of appeal by not informing him of his right to appeal nor confirming he himself agreed to waive appeal.  An IJ violates due process by failing to inform the noncitizen of the right to appeal.  *Ubaldo-Figueroa*, 364 F.3d at 1048.  A valid waiver must be both considered and intelligent, and the government bears the burden of proving a valid waiver by clear and convincing evidence.  *United States v. Ramos*, 623 F.3d 672, 680–81 (9th Cir. 2010).  The Ninth Circuit has held that it will "indulge every reasonable presumption against waiver" and "not presume acquiescence in the loss of fundamental rights." *Id.* (quoting *United States v. Lopez–Vasquez*, 1 F.3d 751, 753 (9th Cir. 1993).  Moreover, "the due process inquiry focuses on whether [the noncitizen] *personally* made a 'considered and intelligent' waiver of his appeal." *Id.* at 680. (citing *Ubaldo-Figueroa*, 364 F.3d at 1049 n.8) (italics in original).

Informing a noncitizen of their right to appeal is "mandatory" and the IJ's failure to do so is a due process violation.  *Ubaldo-Figueroa*, 364 F.3d at 1048

(quoting *United States v. Arce–Hernandez*, 163 F.3d 559, 563 (9th Cir. 1998)).  In *Ubaldo-Figueroa*, the IJ found Mr. Ubaldo-Figueroa to be ineligible for relief and ordered him deported.  *Id.* at 1047.  However, the IJ never informed him of his right to appeal, since his only reference to appeal was his question, "Counsel you want to accept that as a final order or do you want to reserve an appeal?", to which counsel responded, "We'll accept it as a final order your honor."  *Id.*  The Ninth Circuit held that such a waiver was not considered or intelligent because the IJ did not personally inform Mr. Ubaldo-Figueroa of his right to appeal.  *Id.* at 1049.

As in *Ubaldo-Figueroa*, the IJ never explained the right to appeal to Mr. Espinoza and only referenced appeal in a single question posed to counsel.  The present case is more compelling because the question the IJ posed had less information and context, as it was a last-second question phrased as "Does he wish to appeal?" to which Ms. Aitchison answered "No, your honor."  Exh. R at 184–185.  The question only asked about whether Mr. Espinoza wanted to appeal, not whether he wanted to waive appeal.  Ms. Aitchison waived appeal without having confirmed or even being able to confirm that he understood and accepted the decision.  In fact, he did not understand and had never made a personal waiver in the first place.  By having not been informed about his right to appeal or personally waiving his right to appeal, there was no waiver, any imputed waiver was not considered or intelligent, and the IJ decision to enter a waiver of appeal was a violation of due process.

### 3. Mr. Espinoza Suffered Prejudice

But for the ineffective assistance of counsel and due process errors at his final removal proceeding, Mr. Espinoza would have had a plausible claim to relief from deportation.  A noncitizen seeking to prove prejudice need not establish that a fair proceeding would have led to a different outcome, but only that he had a "plausible ground for relief from deportation."  *Melendez-Castro*, 671 F.3d at 955.  "Plausible" relief need not be probable, but it must be more than possible.  *United*

*States v. Cisneros-Rodriguez*, 813 F.3d 748, 761 (9th Cir. 2015).   There are numerous forms of relief that were plausible for Mr. Espinoza at different points of his removal proceeding, and thus he suffered prejudice.

a.   *Mr. Espinoza was U-Visa Eligible*

Mr. Espinoza was prejudiced from receiving a U-Visa because of ineffective assistance and due process errors.  A U-Visa applicant must show they: (1) suffered "substantial physical or mental abuse" from a qualifying crime; (2) possess information concerning the crime; (3) "has been helpful, is being helpful or is likely to be helpful" to an official investigating or prosecuting the crime; and (4) the crime violated federal or state law.  *Id.* at 759 (quoting 8 U.S.C. § 1101(a)(15)(U)(i)).  By regulation, the applicant "must obtain a certification from a law enforcement official to qualify for the visa."  *Id.*   (quoting 8 C.F.R. § 214.14(c)(2)(i)).  Mr. Espinoza was eligible and plausibly would have received a U-Visa but for the due process violations.  *See* DHS, U-Visa Law Enforcement Resource Guide (Mar. 3. 2022) (stating direct victims may include bystanders who suffer a "unusually direct injury," and indirect victims may include unmarried siblings of a direct victim).

Mr. Espinoza was eligible for a U-Visa because he met all the statutory requirements as a direct and indirect victim of rape or direct victim of felonious assault.  He suffered substantial physical and mental abuse since he was beaten around the time of the rapes and traumatically affected when he learned his sister was raped by his father-figure.  Next, he possessed information as a witness to the days of the rape and as someone who knew both the victim and perpetrator.  This is evidenced by the police investigation mentioning him by name and the fact that Mr. Espinoza was sought to testify at trial.  Exh. K at 153; Exh. C at 18.  For the same reasons, he was helpful or likely to be helpful in the investigation and prosecution.  If properly advised, he would have assisted any way he could.  Lastly, the crimes violated state law.  *See* ORS 163.375(1)(b) (First Degree Rape); ORS 163.365 (Second Degree Rape); ORS 163.185(1)(b) (First Degree Assault).

Mr. Espinoza would have plausibly received a U-Visa if he applied in 2010, 2012, or 2018. In 2010, if Ms. Aitchison would have conducted basic factual investigation, she would have uncovered potential U-Visa eligibility for the entire family and advised them to report the crimes to police. *See e.g., United States v. Morelos-Navarro*, 742 Fed. Appx. 226, 229 (9th Cir. 2018) (unpublished) (holding that defendant, with competent counsel, would have taken "a number of plausible steps" to secure a visa or outcome besides removal). Between 2010 and 2012, if Ms. Aitchison had worked on basic factual development for the cancellation application, she would have come across his eligibility or been made aware when his family reported the conduct to police. Further, in 2012, if aware of his potential eligibility, Mr. Espinoza could have posted bail in his criminal case and assisted directly in the investigation and prosecution. Even in 2018, if Ms. Aitchison had done a re-evaluation, she could have determined potential U-Visa eligibility and sought a continuance or termination of proceedings. *See Ramirez Sanchez v. Mukasey*, 508 F.3d 1254, 1255–56 (9th Cir. 2007) (continuance); 8 C.F.R. § 214.14(c)(1)(i) (termination). Even after a removal order, she could have advised him to petition for a U-Visa and request a stay of removal. *Id.* § 214.14(c)(1)(ii).

As in *Cisneros-Rodriguez*, Mr. Espinoza would have plausibly applied for and been granted a U-Visa despite a criminal record. *See Cisneros-Rodriguez*, 813 F.3d at 761. There, Ms. Cisneros-Rodriguez was placed in administrative removal proceedings and misadvised by ICE agents regarding her right to counsel. *Id.* at 758. In analyzing plausibility, the Court stated that DHS policy is to stay proceedings and removal of someone U-Visa eligible and that being a U-Visa recipient would lead to cancellation of the removal order. *Id.* at 761 (citing 2009 DHS Memo and 8 C.F.R. § 214.14(c)(5)(i)). The Court also determined that between 2009 and 2015, 70% of U-Visa applicants were granted and, against this baseline, her U-Visa was plausible. *Id.* at 762. Ms. Cisneros-Rodriguez had "a substantial criminal record" but had lived practically her entire life in the U.S. and

had U.S. citizen relatives.  *Id.*  The same high-percentage baseline and facts apply to Mr. Espinoza's case.   As even stronger evidence, both his sister and mother received U-Visas for their assistance to law enforcement.

> b.  *He was Prejudiced from Receiving Voluntary Departure*

Mr. Espinoza was prejudiced from receiving voluntary departure as well.  A noncitizen may be granted pre-conclusion voluntary departure if the noncitizen is not deportable as an aggravated felon or terrorist.  8 U.S.C. § 1229c(a)(1).  For discretionary relief, there must be "a 'plausible' showing that the facts presented would cause the Attorney General to exercise discretion in his favor." *United States v. Rojas-Pedroza,* 716 F.3d 1253 (9th Cir. 2013) (citing *Barajas-Alvarado*, 655 F.3d at 1089).  This involves identifying the relevant factors and determining whether, considering those factors and the noncitizen's unique case, relief was plausible.  *Id*.  For voluntary departure, the IJ must weigh positive and negative equities.  *Id.* at 1264.  Positive equities include "long residence, close family ties to the United States, and humanitarian needs," while negative equities include: "the nature and underlying circumstances of the deportation ground at issue; additional violations of the immigration laws; the existence, seriousness, and recency of any criminal record; and any other evidence of bad character or undesirability of the applicant as a permanent resident." *Id.* at 1265.

Given Mr. Espinoza's significant positive equities, he could have plausibly received voluntary departure if Ms. Aitchison had argued on his behalf or if the IJ had ensured a full and fair hearing.  He had a long history of residence, close family ties, and humanitarian concerns urging a positive grant of discretion.  At the time of his removal hearing, he was thirty years old and had lived in the U.S. since he was four years old.  He attended kindergarten through high school in the U.S. and was a primary English speaker.  He had one eight-year-old U.S. citizen child for whom he cared.  Additionally, he and his family suffered significant, traumatic abuse at the hands of his quasi-stepfather.  His mother and sister even had pending

1    U-Visa petitions based on that abuse at the time of his removal.

2       Mr. Espinoza's negative equities, specifically his conviction, fail to show

3 that voluntary departure was not plausible.  First, the nature and circumstances of

4 the deportation ground are relatively benign considering Mr. Espinoza was charged

5 as being inadmissible for having entered without inspection at four years old.  This

6 was his only illegal entry, and he had no additional immigration law violations.  The

7 only concerning negative equities to balance were his conviction and alleged

8 alcohol abuse; however, neither factor was insurmountable.  His crime was almost

9 six years old by the time of his final hearing.  He served his time in prison and

10 indicated his desire for self-improvement by completing his GED and tutoring.

11 Additionally, the trauma he experienced and its relationship to the crime is

12 mitigating evidence when assessing seriousness.  *Matter of B-Z-R-*, 28 I.&N. Dec.

13 563 (A.G. 2022); *Gomez-Sanchez v. Sessions*, 887 F.3d 893 (9th Cir. 2018).   In

14 other words, despite his crime and alcohol use, there was more than enough

15 "evidentiary basis on which relief could have been granted" and thus voluntary

16 departure was not just theoretically possible but also plausible.  *United States v.*

17 *Reyes-Bonilla*, 671 F.3d 1036 (9th Cir. 2012).

18            *c.*     *He was Prejudiced from Other Relief*

19       There are at least three other forms of relief that Mr. Espinoza was plausibly

20 entitled to receive: (1) Asylum; (2) T-Visa; and (3) DACA.  Even if not ultimately

21 successful, each could have been used as a way for his removal case to be

22 terminated as a matter of prosecutorial discretion.  Additionally, the fact they were

23 unexplored by Ms. Aitchison provides further evidence of her ineffectiveness.

24       To be granted asylum, a noncitizen must show they are unable or unwilling

25 to return to their home country due to a "well-founded fear" of persecution on

26 account of race, religion, nationality, membership in a particular social group, or

27 political opinion.  8 U.S.C. § 1101.  Mr. Espinoza and his family are of indigenous

28 decent, specifically of the Mixtec people, and Ms. Espinosa-Lopez herself fled

domestic violence.  Ms. Aitchison had saved a 2010 Department of State Human Rights Report that indicated "indigenous communities have long been socially and economically marginalized and subjected to discrimination," while also including an examples of a Mixtec political leader who was tortured and murdered.  Exh. J at 106, 134.  Mr. Espinoza and his family had a viable race-based claim to asylum that Ms. Aitchison failed to investigate.  *See also* Lynn Stephen Ph.D., *Gendered Violence and Indigenous Mexican Asylum Seekers: Expert Witnessing as Ethnographic Engagement*, 91 ANTHROPOLOGICAL QUARTERLY 325–63 (2018).

To be eligible for a T-Visa, a noncitizen must: be or have been victim of a "severe form of trafficking;" is in the U.S. "on account of such trafficking;" has complied with any reasonable request for assistance in the investigation or prosecution of that trafficking, is unable to cooperate due to trauma or has not obtained 18 years of age; and would suffer extreme hardship involving unusual and severe harm upon removal.  8 U.S.C. § 1101 (a)(15)(T).  Severe trafficking includes "the recruitment, harboring, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion" for the purpose of involuntary servitude.  22 U.S.C. § 7102(11).  Here, Mr. Espinoza was brought into the U.S. by smugglers and led to a migrant campground where Fredy exploited their vulnerability through force, fraud, and coercion.  As a result, he worked as a child laborer without pay from an extremely young age.  Cooperation is not required by statute, but as discussed with regards to the U-Visa, he would have reported the crime and cooperated if properly advised.  Lastly, he would have and did experience extreme psychological hardship upon being removed to a country he does not know.

To be eligible for DACA, a noncitizen must: arrive under age sixteen; continuously reside in the U.S. for five years before June 15, 2012; complete high school or a GED, be in school, or be an honorably discharged veteran; not be convicted of a felony, serious misdemeanor, multiple misdemeanor offenses, or not be a risk to public safety; and not be over thirty.  Janet Napolitano, Exercising

Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012).   In 2012, Mr. Espinoza met all these requirements aside from having a GED.  Had Ms. Aitchison called him between June 15 and July 16, 2012, to inform him of the policy, he would have been able to complete his GED and qualify for DACA in a matter of days.  She would have then plausibly convinced DHS to dismiss proceedings per 8 C.F.R. § 1239.2(c) or not seek removal.  *See* Deferred Action for Childhood Arrivals, 86 Fed. Reg. 53736 (Sept. 28, 2021) (stating ICE relies on DACA to determine whether to "continue, administratively close, or dismiss the removal proceedings without prejudice").

### d.    *His Conviction is not an Aggravated Felony*

Mr. Espinoza was not convicted of an aggravated felony and can show prejudice on all relief.  He pled guilty to ORS 163.175, which is conceivably a crime of violence under 8 U.S.C. § 1101(a)(43)(F).  This Court applies the "categorical approach" to ask whether the elements of the conviction sufficiently match the elements of the relevant federal crime.  *Mathis v. United States*, 136 S. Ct. 2243, 2248 (2016).  When a statute "sets a single (or 'indivisible') set of elements" that does not match the federal crime, the conviction does not qualify as the federal crime.  *Id.* at 2248–49.  If a statute is "divisible" and lists multiple crimes, this Court applies the "modified categorical approach" and makes a limited inquiry into the record of conviction to identify the crime before deciding whether the elements match.  *Id.* at 2249.  A crime of violence is defined as a crime that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 16(a).  *see Sessions v. Dimaya*, 138 S.Ct. 1204 (2018) (invalidating 18 U.S.C. § 16(b) for vagueness).

Due to the ambiguities of the record, this Court should find Mr. Espinoza pled to reckless Second Degree Assault.  By the terms of the plea petition, Mr. Espinoza pled to Second Degree Assault as the lesser-included-offense of First Degree Assault, but there is no further indication of which sub-section.  The only

iteration of Second Degree Assault on the record is in the Information, which charged him with "recklessly, under circumstances manifesting extreme indifference to human life" causing serious physical injury. Although the petition had the word "knowingly" in the factual basis, this is not determinative since the factual basis also satisfied the elements of ORS 163.175(c). Furthermore, in the plea petition the word "knowingly" is written over the scratched-out "accidentally;" there is, however, no annotation or initial to show Mr. Espinoza acknowledged, considered, or agreed to the change. Thus, the word "knowingly" should be disregarded, and Mr. Espinoza should be deemed to have pled to ORS 163.175(c).

As such, his plea to ORS 163.175(c) was not a crime of violence because, in 2018, a reckless mens rea was plainly insufficient. *See Tristan v. United States*, 2018 WL 3117637 (D. Or. 2018) (unpublished) (citing *United States v. Dixon*, 805 F.3d 1193, 1197 (9th Cir. 2015), and *United States v. Parnell*, 818 F.3d 974, 982 n.5 (9th Cir. 2016)). Recent Supreme Court precedent supports the proposition that reckless conduct is never a crime of violence because the definition demands force be targeted "against another," which reckless conduct does not satisfy. *Bordon v. United States*, 141 S.Ct. 1817, 1825–26 (2021). Moreover, the statute is largely used to criminalize drunk driving accidents, *see e.g. State v. Corpuz*, 49 Or. App. 811 (1980), and so *Leocal v. Ashcroft*, should control. *See* 543 U.S. 1 (2004) (holding DUI statute requiring a negligent mens rea was not a crime of violence).

However, even if Mr. Espinoza is deemed to have pled to knowing assault under ORS 163.175(a) or (b), the conviction is still not a crime of violence because Oregon Second-Degree Assault, in 2013, only required that an individual is aware of the "assaultive nature" of the conduct and required no mens rea regarding the resulting injury. State v. *Barnes*, 329 Or. 327, 338 (1999). For this reason, *Leocal* and *Bordon* control because ORS 163.175 does not necessarily involve the targeted use or threatened use of force against another. Because an individual only must know their action is assaultive, this means the knowing mens rea is akin to

knowledge of simple assault or offensive touching and therefore does not satisfy the knowledge of violent force that would cause injury.  *See e.g. Singh v. Ashcroft*, 386 F.3d 1228 (9th Cir. 2004) (holding Oregon harassment is not a crime of violence because it only involves intentional offensive physical contact).

Lastly, even if Mr. Espinoza's conviction is an aggravated felony, but for ineffective assistance and due process errors, he plausibly would have succeeded in post-conviction relief under ORS 138.510.  The statute authorizes relief based on denial of constitutional rights.  ORS 138.530(a)(1).  A criminal defense attorney's failure to inform the immigration consequences of a conviction entitles a petitioner to relief.  *Gutale v. State of Oregon*, 364 Or. 502, 505 (2019) (citing *Padilla*, 559 U.S. 356 (2010)).  Here, the criminal defense attorney, Mr. Bucher, did not advise Mr. Espinoza that upon deportation he would be permanently ineligible for a visa. Had Ms. Aitchison been in contact with Mr. Espinoza after his conviction and provided competent advice, she would have informed him that his plea rendered him permanently ineligible for a visa upon deportation.  Even if she had only spoken to him in 2018, Mr. Espinoza could still be entitled to relief.  *Id.*

**B.    Mr. Espinoza Exhausted Available Remedies and Was Improperly Deprived of Judicial Review**

Per the requirements of § 1326(d), Mr. Espinoza must show that he "exhausted any administrative remedies that may have been available to seek relief against the order" and that the removal proceedings "improperly deprived [him] of the opportunity for judicial review." 8 U.S.C § 1326(d)(1-2).  He has satisfied both requirements for two reasons.  First, if Mr. Espinoza proves he received ineffective assistance of counsel, he has necessarily shown that he exhausted his available administrative remedies and was improperly deprived of judicial review.  Second, if he proves that his waiver of appeal was invalid, he also has made the same showing.  Mr. Espinoza will show he satisfies these requirements, not that they should be excused.  *See United States v. Palomar-Santiago*, 141 S. Ct. 1615 (2021).

1       1.      Mr. Torres-Espinoza Exhausted Available Remedies

2       Under *Palomar-Santiago*, § 1326(d)(1) is typically fulfilled upon the

3   noncitizen filing of appeal of the IJ's decision to the BIA.  *Palomar-Santiago*, 141

4   S. Ct. at 1621.  However, the ability to file such an appeal must be "available" to

5   the noncitizen. 8 U.S.C. § 1326(d)(1); *see also Ross v. Blake*, 578 U. S. 632, 639

6   (2016) (holding that "availability" of remedies depends on the real-world capability

7   of using the remedy to secure relief).  Because Mr. Espinoza received ineffective

8   assistance of counsel that impeded his ability to appeal, and because the IJ entered

9   an invalid waiver of appeal, he had no available remedies as a matter of right and

10  has thus satisfied the administrative exhaustion requirement.

11      Ms. Aitchison's ineffective assistance rendered his administrative remedies

12  unavailable because she erroneously advised him while also unlawfully depriving

13  him of his right to counsel.  A noncitizen can satisfy the administrative exhaustion

14  requirement upon showing that the ineffective assistance of counsel "caused [the

15  noncitizen's] failure to exhaust administrative remedies." *Lopez-Chavez*, 757 F.3d

16  at 1044.  Here, Ms. Aitchison's determination that he was ineligible for relief and

17  bond led to his detrimental reliance on her advice.  *Id.* (finding 1326(d) met when

18  counsel declined to pursue an open question of law).  Moreover, she advised him

19  to accept deportation or voluntary departure by assuring him there was a minimal

20  difference between the two, thus depriving him of the knowledge that would urge

21  him to appeal the IJ's decision.  Ms. Aitchison secured his removal by pressuring

22  him to accept departure under the threat of withdrawal.  *See Nehad*, 535 F.3d at

23  967–72.  As a result, her ineffectiveness directly caused his failure to appeal.

24      Additionally, the invalid waiver entered by the IJ rendered his administrative

25  remedies unavailable because Mr. Espinoza was deported in a matter of days after

26  final hearing, despite never having waived appeal himself, much less done so in a

27  considered and intelligent manner.  The administrative exhaustion requirement is

28  satisfied when the noncitizen's right to appeal was denied in violation of due

process.  *Gomez*, 757 F.3d at 893.  Here, Ms. Aitchison failed to explain his right to appeal entirely and secured his acceptance of removal by misadvising him on the viability of relief and the consequences of deportation.  Even if Ms. Aitchison did advise him before the hearing, she had no way to confirm during or after the hearing that he agreed to waive appeal, which is particularly egregious when considering the clear due process errors.  Further, the IJ failed to inform Mr. Espinoza of his right to appeal or ensure he personally agreed with a waiver.  *See Ubaldo-Figueroa*, 364 F.3d at 1049–50.  The government carries the burden of showing a valid waiver by clear and convincing evidence, which is even harder than cases like *Gomez* where the noncitizen had signed an appeal waiver.  *Gomez*, 757 F.3d at 890.  Thus, there is no valid appeal waiver, and thus no administrative remedies were available.

### 2.   Mr. Espinoza was Deprived of Judicial Review

Under *Palomar-Santiago*, § 1326(d)(2) refers to the inability to "fil[e] a petition for review of a BIA decision with a Federal Court of Appeals." *Palomar-Santiago*, 141 S. Ct. at 1621.  A noncitizen must identify an "obstacle that prevented him from obtaining judicial review of a deportation order."  *United States v. Gonzalez-Villalobos*, 724 F.3d 1125 (9th Cir. 2013).  Typically, if a noncitizen shows he or she was improperly deprived of the right to appeal to the BIA, that will necessarily satisfy the requirement he or she show improper deprivation of judicial review.  *United States v. Pallares-Galan*, 359 F.3d 1088, 1096 (9th Cir. 2004).

Ms. Aitchison's ineffective assistance improperly deprived Mr. Espinoza of judicial review.   A noncitizen can satisfy the deprivation of judicial review requirement upon showing that the ineffective assistance of counsel "deprived him of his opportunity for judicial review."  *Lopez-Chavez*, 757 F.3d at 1044 (citing *Gonzalez-Villalobos*, 724 F.3d at 1131 n.9 and *Cerna*, 603 F.3d at 35).  Just as Ms. Aitchison's erroneous advice impeded him from appealing, it necessarily prevented him from seeking a petition for review of the BIA decision.  *See Pallares-Galan*, 359 F.3d at 1096.  Because Ms. Aitchison assured him deportation and voluntary

1    departure would have minimal differences, he had no reason to appeal the IJ

2    decision or consider a petition to the Ninth Circuit.   Therefore, even without

3    considering the invalid waiver, Ms. Aitchison's ineffective assistance of counsel

4    served as a clear obstacle that prevented judicial review of the deportation order.

5          Finally, the invalid waiver entered by the IJ improperly deprived Mr.

6    Espinoza of judicial review because he was deported only four days after his final

7    hearing, despite never having waived appeal himself.  An invalid waiver of appeal

8    improperly deprives a noncitizen of judicial review.  *Ubaldo-Figueroa*, 364 F.3d at

9    1049–50; *United States v. Copeland*, 376 F.3d 61, 70 (2d Cir. 2004).  To reiterate,

10   Ms. Aitchison failed to explain his right to appeal and secured any implied consent

11   to waive appeal through misadvise and malpractice.  Further, the IJ failed to inform

12   Mr. Espinoza of his right to appeal or personally confirm his waiver, each of which

13   is an independent reason the waiver is invalid.  As such, the entry of an invalid

14   waiver was a clear obstacle that improperly deprived him of judicial review.

15   **IV.    CONCLUSION**

16         For the foregoing reasons, Mr. Espinoza respectfully requests that this Court

17   dismiss the Information under 8 U.S.C § 1326(d).

18

19                                   Respectfully submitted,

20

21   Dated:  April 14, 2023          *s/ Marc Jácome*
                                     Federal Defenders of San Diego, Inc.
22                                   Attorneys for Mr. Espinoza
                                     Email:  Marc_Jacome@fd.org
23

24

25   Dated:  April 14, 2023          *s/ Carmel Abuzaid*
                                     Federal Defenders of San Diego, Inc.
26                                   Attorneys for Mr. Espinoza
                                     Email:  Carmel_Abuzaid@fd.org
27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>Index of Exhibits</u>**

*USA v. Hector Torres-Espinoza*

*Motion to Dismiss Under 8 U.S.C. § 1326(d)*

Exhibit A – Declaration of Hector Torres-Espinoza ……………………………1-7

Exhibit B – Declaration of Eleuteria Espinosa-Lopez …………………………8-14

Exhibit C – Declaration of Marisela Espinoza-Lopez ……..…………………15-19

Exhibit D – Declaration of Victor Espinosa-Lopez …………………..………20-23

Exhibit E – Immigration Retainer Agreement …………………………………24-30

Exhibit F – Immigration Attorney Notes ………………………………………31-36

Exhibit G – Notice to Appear ……………………………………………...…37-39

Exhibit H – IJ Proceeding of October 4, 2011……………………………….40-43

Exhibit I – Cancellation of Removal Application …………………………….44-77

Exhibit J – Immigration File Unsubmitted Documents ……………………..78-142

Exhibit K – Fredy Police Report & PSR ………………………………...143-158

Exhibit L – Marisela Espinoza-Lopez U-Visa Approval …………………159-162

Exhibit M – Eleuteria Espinoza-Lopez U-Visa Approval …………………163-165

Exhibit N – Information ……………………………………………...166-167

Exhibit O – Indictment ………………………………………………168-170

Exhibit P – Plea Petition ………………………………………………....171-175

Exhibit Q – Request for Bond & Rejection ……………………………..176-179

Exhibit R – IJ Proceeding of June 15, 2018 ………………………………180-186

Exhibit S – Removal Order………………………………………………...187-188

Exhibit T – EARMS Print-Out…………………………………………..189-190

23-CR-00144-TWR